# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 03 2019, 6:20 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Emily S. Waddle
DeMotte, Indiana

ATTORNEY FOR APPELLEE

Adam J. Sedia
Hoeppner, Wagner & Evans, LLP
Merrillville, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

In Re: The Marriage of
Sam Witvoet,

*Appellant*,

v.

Rachel Witvoet,

*Appellee*.

July 3, 2019

Court of Appeals Case No.
19A-DC-178

Appeal from the Lake Circuit Court

The Honorable Marissa J. McDermott, Judge

The Honorable George Galanos, Judge Pro Tempore

The Honorable Stephen E. Scheele, Magistrate

Trial Court Cause No.
45C01-1801-DC-28

**Brown, Judge.**

[1] Sam Witvoet ("Father") appeals from the trial court's decree of dissolution. Father claims the court erred in not continuing the final hearing and in determining his child support obligation. We affirm.

### Facts and Procedural History

[2] Father and Rachel Witvoet ("Mother") were married in 2012 and have three children together. On January 31, 2018, Mother filed a petition for dissolution.[1] An entry in the chronological case summary ("CCS") dated March 22, 2018, states: "Received March 13, 2018. Provisional Order on Hearing Held February 18, 2018 and February 19, 2018. Granted." Appellee's Appendix Volume II at 3. The court entered an "Order from Hearing of June 13, 2018," stating that Mother appeared in person and with counsel and Father appeared in person, that Father violated the provisional order, was in arrears by $19,200, and has shown repeated instances of willfully not following the court's orders including removing property and equipment from the marital residence without authorization, that as a sanction Father was sentenced to jail for thirty days, and that Father may purge himself from the contempt by paying bond in the amount of $2,500 cash. *Id*. at 13. Entries dated June 13, 2018, in the CCS state the court scheduled a status conference for September 12, 2018, and a final dissolution hearing for September 20, 2018. An "Order of August 14, 2018," states that Father paid a $2,500 cash bond to the county clerk and had purged

---

[1] The record does not include a copy of the petition.

himself of the contempt finding. *Id*. at 16. On September 19, 2018, the court issued an "Order Setting Final Hearing" stating that the final hearing was set for one-half day beginning at 9:30 a.m. on November 2, 2018, that the parties "shall be prepared to have the entirety of their respective cases presented and concluded within the allotted time," that the conclusion of all discovery "shall occur no later than October 19, 2018," that the parties "shall exchange all final exhibits (pre-marked) and a witness list at least seven (7) days before the Final Hearing," and that "[f]ailure to comply with this Order or applicable rules may result in the dismissal, default, delay of the Final Hearing, the exclusion of evidence, or sanctions." *Id*. at 17.

[3] On November 2, 2018, the court held a final hearing at which Father appeared *pro se* and Mother appeared by counsel. At the start of the hearing, Mother's counsel indicated that he had tendered written discovery to Father, Father had not responded, and Mother was requesting a continuance. Mother's counsel stated that Father had not provided any responses to a request for production or to interrogatories, that "[b]asically [Father's] allegation is that everything is owned by somebody other than him, and [] it's false," and that "the purpose of the discovery was to generate proof of that and he's provided nothing." Transcript Volume 2 at 4. The court denied the request. Mother testified that she had lived with Father for fifteen years and had lived at the marital residence for seven years, the house was titled in Father's name, a realtor told her that it would sell for around $220,000, and the mortgage payoff amount was around $164,000. She testified the mortgage was in default, there was a provisional

order for Father to pay her $1,300 a week, and Father had moved out on January 20th, never gave her a penny, and owed her $45,200. She testified that Father's parenting time was minimal and he had the children a total of twenty-six overnights since January 20th. She testified that she sold clothing for a company from California.[2] When asked for Father's gross income in 2017, Mother replied "I believe the total for last year was close to $220,000, that was just deposited into our account or in farming deposits and checks from Grain Elevators." *Id*. at 11.

[4]     Mother presented bank statements from June 2017 through January 2018.[3] Father stated the statements "just show everything we make and nothing that has to be paid." *Id*. at 12. Mother indicated the statements "do show money in and out" and that the account was the account "the two of [them] lived out of." *Id*. at 13. When asked Father's net income for the last year that she knew the expenses, she replied that she thought it was close to $100,000 and said "there was quite a bit depending on what we bought that year [] tractor-wise, because we were always buying and selling tractors" and "[d]ifferent farm equipment in order to farm." *Id*. at 14. When asked if there was "a time when the two of you stopped doing the farm stand," Mother testified:

---

[2] Mother submitted a child support worksheet reflecting an annual income of approximately $20,000. At the hearing, when asked if she had "any other expenses that come off of that profit," she replied affirmatively and referred to travel expenses and event fees. Transcript Volume 2 at 66.

[3] The bank statements, for periods ending June 23, 2017, through January 25, 2018, reflect deposits of $9,094, $10,222.10, $10,259.34, $24,513.40, $54,122.84, $6,383.04, $55,738.39, and $7,480.90, for total deposits of $177,814.01.

Yes [], we stopped last year, we did not do it . . . before he even moved out and we separated. We did quit vegetable farming becaue [sic] he had gotten sprayed with chemicals very bad. He had a seizure. His dad had passed; that was very traumatic. He got a concussion. Got hit in the head. It was just too much. We ran, we owned and ran a farm stand for seven years so we farmed the vegetables. It was a lot of work. Him and I basically did it together by ourselves. . . . So, after the vegetable farming ended, we still did farm. We farmed close to 250 acres. Twenty of which we owned, it's in his name. . . . And we did grain farming. We did field corn, soy beans.

*Id.* at 14-15. She indicated the parties owned twenty acres and rented the other farmland. Mother testified that Father also works as a truck driver, "[w]e have owned multiple semis," that he would haul machinery for his uncles, that one of his uncles owns an auction service and he would travel "hauling equipment for him, which is where the majority of the money [came from] throughout the year in order to pay the bills," and that "[t]he farm stand was only open four months out of the year." *Id.* at 15. She testified the parties stored all of their machinery in a barn-type building near the marital residence. She indicated that, until the divorce, Father never alleged the property stored in the building, including the tractors, gooseneck trailers, combines, and corn and soy heads, were owned by anyone other than the parties. She indicated Father's claim was not true, she was present when he purchased some of the machinery and had seen invoices, and he had her write the purchases off the taxes.

Mother presented certificates of title for different vehicles and trailers.[4] She testified regarding the titles to a refrigerated trailer that was used to haul vegetables, a grain trailer that had been removed from the property by Father, a semi-tractor owned by Father which she had seen parked in his uncle's driveway, a gooseneck trailer, and several other titles. She testified: "Every time we have had court, except for today, he has either come the day before or the day after and taken more items off the property. Every single time." *Id*. at 22. She testified the parties owned three boats, one of which was filled with trapping supplies. She testified regarding various photographs she had taken of Father and members of his family removing property from the marital residence and a handwritten receipt for a skid steer. She testified that the last time the parties were in court, the court ordered Father not to remove anything else and that the next morning Father took another trailer. She indicated Father worked for years and then, when the divorce was filed, "now suddenly he says . . . there's no work at all." *Id*. at 39. When asked what life was like during the last nine months while Father did not pay her anything, Mother testified that she had 150 animals including ducks, goats, and peacocks, she sold property primarily to purchase propane, and she and the children did not have hot water, a stove, or a dryer for six weeks. She testified that she sold a gun safe which was in her house and belonged to her, that one of Father's uncles had claimed the safe belonged to him, that she was harassed for weeks and received calls

---

[4] The names on the titles include Father and Witvoet Produce.

from Father saying that she was going to jail, that she was investigated for theft, and that a detective eventually saw a receipt and dropped the investigation. She testified there were lots of guns, she had them appraised and sold seven of them for their appraised values, and she presented an appraisal which listed thirty-nine firearms.

[6] Mother presented a schedule of equipment and property which she believed Father had taken from the residence and values for the property totaling $196,280.[5] She also presented a list of property she sold including the gun safe and guns. When asked if she had seen Father working, Mother stated "[y]es. I have seen him in his semi driving the semi with a trailer with machinery on the back," from which she concluded he was working, and that she had last observed him "probably three days before our last court hearing, the status conference." *Id.* at 67. Mother presented a schedule containing her proposed valuation of the marital estate which included among other things a value of $50,000 for equity in the marital residence, $29,000 for twenty acres adjacent to the home, the assets removed by Father of $196,280, items sold by her of $4,150, and other personal property and liabilities, provided the value of the net estate was $266,110, and noted that Father still owed her $45,200 in provisional maintenance. Mother also submitted a child support calculation worksheet

---

[5] The schedule listed, among other property, the following: 2003 semi, 2007 semi, 1997 dry box trailer, 1980 grain trailer, flat beds, skid loader, tractor with mower, 2004 trailer, corn head, combine, bean head, John Deere planters and tractors, plow, Farmall tractor, soil finisher, sprayer, boat with trapping supplies, lawn mower, large anvil, scale, semi tires, ladders, large and small tool boxes, generator for house, impact wrench, pallet of fertilizer, hydraulic fluid, large welder, nail guns, pressure washer, and deep freezers.

which included weekly gross incomes of $384.62 for her and $1,346.15 for Father. On cross-examination, Father asked "isn't it true that the taxes show we made 17,000 a year for the last three years, maybe 18,000," she replied "[a]fter write-offs, yes" and "[a]fter buying farm equipment." *Id*. at 81. When asked "[d]on't you see that it's hard first to live the lifestyle and own this equipment that you're saying that we owned that was my father's with by making $17,000 a year," she answered "[t]hat's not what we made. That was after we bought the farm equipment and lived the lifestyle." *Id*.

[7] Mother's counsel asked that Father not be permitted to submit evidence because he had not responded to discovery, or alternatively offered to return another day after Father responded to discovery. The court noted its September 19, 2018 order and stated "I'm going to take that towards the weight of the evidence and credibility on it." *Id*. at 85. The court asked Father if he understood the penalties in the order, and he replied "Yes, Your Honor. I haven't taken up any time, Your Honor." *Id*. at 86. Upon questioning by Mother's counsel, Father indicated that he had been served with and signed for interrogatories and a request for production of documents and stated "I didn't answer them because I figured you already knew the answers; she has all the documents." *Id*. at 87. When asked "[o]ne of the questions was please provide a list of all the assets that were removed from the marital residence . . . [i]s there a reason you didn't answer that," he replied "because none . . . of the items were mine." *Id*. He stated "I didn't even pay attention to the list" and, when asked "did . . . you read this or not," answered "[n]o." *Id*. at 88. When asked if

Mother had copies of all of his business expenses for 2017, he replied affirmatively and testified "[s]he always had them. That was her job. She did the taxes," "if I did something in the vehicles, [] she got all the receipts," and "she has . . . all the documents." *Id*. Mother's counsel asked "[p]lease produce any and all documents reflecting the ownership of all items removed from the property . . . did you do that," Father answered "[n]o. I didn't, I didn't fill out any of it. I didn't return it to you because she has all the documents." *Id*. at 89.

[8] The court then told Father that he had the opportunity to present his case. Father testified:

> I'm testifying that soon to be ex-wife knows we never had a pot to piss in. That we [] borrowed our whole life to make it. We worked hard trying to make it, we never could. Farming was rough. Um, our family, my family was very, very close. Always has been. My father passed away. Items we leave by his house, he farm. My uncle farm. We borrowed stuff to each other and what not. She knows all this. I don't know how she can sit up here and say that that wasn't true. All the equipment is my mother's. My dad passed away. My mother allowed us to use it. We purchased a couple small items. We've never had enough money to do anything like that. We were fortunate enough to have a family like mine. My uncle borrowed us money when we couldn't make rent. We're deeply in debt to him along with a couple other family members. . . . The property that was brought up by father and my uncle purchased, . . . my father passed away, he wanted me to have it. We never paid a dime on it. The $7,000 payments we made every year were just pure interest to keep the property from going to the banks. That's all we were able to make and most of the time my uncle would make that payment for us.

> The items taken off the yard, [] the last Judge ordered that
> nothing be moved, everything was froze. She started selling the
> cattle. She started selling everything she could, giving stuff away.
> . . . Most of the items on the property weren't ours. There is
> some stuff that is ours, but most of it was not. . . . The title she
> holds for the goosenecks and everything, the witnesses we were
> going to call with my uncles, they're going to show proof of it.
> The credit cards. The bank statements. . . . I want my children
> half the time. . . . The time she said, the twenty-seven days as
> this was going on that I've had my kids, I fought to get my kids
> every week. I was supposed to get 'em every week. I'd call every
> night. She would not let me talk to them to say goodnight. Most
> of the time she would not let me even have them.

*Id*. at 92-93.

[9] On cross-examination, Mother's counsel asked Father how he was able to gross $220,000 in 2017 and nothing in 2018, and Father replied that he never made that much, and when asked about the bank statements and "[y]ou were putting 24,000 a month in the bank," Father replied:

> That's how farming goes. When you pick your grain. It's all
> taken to the elevator. They write you a big sum check. Say it's a
> hundred thousand, two hundred thousand. Usually in the last
> three, four years when we pay off the seed and everything else,
> we're twenty, thirty, forty thousand behind. It always looks good
> when you're taking money in. If you show, if she'd show all the
> documents paying all the bills and everything, like I said, the last
> three years of taxes we made $17,000 a year.

*Id*. at 96. When asked "[w]hat do you think that is," he said "[w]e got the house. We have a couple other things in the yard." *Id*. When asked if he owned any John Deere tractors, he replied "[n]o . . . they were my father's." *Id*. He testified "I've seen one of her receipts and it was all in her handwriting." *Id*.

at 97. He indicated that one of his cousins was present on his behalf. The following exchange occurred between the court and Father:

> The Court: Are you resting?
>
> [Father]: I'm not resting. I, I have proof of the property and what's owed on it, um, a couple of things I'd like for, to show copies of her because I, I, she feels there's $29,000 owing on the property. There's like $229,000 owed on the property and I just wanted to just make it clear to her that what, what it is is what it is.
>
> The Court: I'm a little troubled with the discovery that he tendered to you asking for that and, but you point blank said I didn't bother reading it because she had it all.
>
> [Father]: Yes.
>
> The Court: Okay. I'm troubled by that comment. And now you're saying well, I've got stuff to prove that she's wrong, that's not how it works.
>
> [Father]: Um, it hasn't worked for me the whole time, so. I, I'm not a lawyer. Freshman year I quit, I had to go to work because my family wasn't doing good. I'm not a lawyer. I don't have the money for a lawyer. That's why I don't have an attorney. She doesn't either; if they're thinking I'm going to pay it, with what? It's, this whole thing's a big myth of what I have and I don't. I wish I had all this stuff; she could have it. I, there, there's nothing there.
>
> The Court: I'm troubled by the Court's Order that says nothing is to be removed, personal property or for the farm and then I've got uncontroverted evidence with photographs where large farming implements were removed.
>
> [Father]: Yes, Your Honor. And they were removed because they are not ours. She was selling other people's stuff.

The Court: It was ordered not to be removed, and yet you were part of the removal.

[Father]: Yes, Your Honor.

* * * * *

The Court: . . . I'm looking at the Order that was issued by this Court that says nothing to be removed.

[Father]: Yes.

The Court: Period.

[Father]: She removed many, many, many items. Nothing was ever touched in the yard until she started selling other people's stuff and giving other people's stuff away. Cattle; whether it was animals or machinery that wasn't her's [sic]. That's why everybody got upset because it wasn't our stuff to sell.

The Court: Do you have anything else?

[Father]: No.

The Court: Okay; go and take your seat.

[Father]: Your Honor, if I, if I may speak; one more thing. If we would have waited until now, all that stuff you see in the pictures that isn't ours and someone else's would have been sold. It would have been gone. She would have sold it. She's after money. Money and my children are pawn to her and it's just money that's not there. And you, you take whether you believe that or not but that's the truth.

The Court: [Mother's counsel], do you want to give a closing with the understanding that I'll give him the opportunity to do a closing as to what the relief is requested and I'll have under the Rules of Evidence and Trial Procedure you'll have the last say. Let me explain this to [Father]. I'm at a point now where I'm

asking for closing arguments, okay. This is not evidence. It's what you're asking me to do.

*Id*. at 98-100. Mother's counsel then presented a closing argument and requested an equal division of the marital property. In closing, Father argued the gun collection was a gift, the farm had been in his family for years, if the equipment belonged to the parties Mother could have half of it, there were loans against the semis, he could not pay what he did not have, and that he did not farm the last year and someone else was farming the property they had rented. The court referred to the discovery requests and stated "you testified from the stand on multiple times that you didn't bother answering it because she had all the answers," and Father replied "[y]es." *Id*. at 109. The court reminded Father that he was not presenting evidence but a summary of his presentation. Father stated "I have it with me. I have evidence for, for the loans and everything with me," "what I made clear to me with the last time was to bring in my uncles, to bring in who owned liens," and "that's why I brought them with." *Id*. The court asked if Father understood the court previously ordered the parties to identify any witnesses and exhibits that were to be presented, and he replied affirmatively. The court told Father to continue, and he argued that "the house and stuff can be sold; split in half," "[t]hat's pretty much all we own," "[t]here's a trailer and a few pieces of equipment I suppose," "there a two hundred and some thousand dollars we owe," he felt the guns were his to be handed down to his children, and "[e]verything else she can [have] half of." *Id*. at 110. The court asked Father if he had anything further, and he replied "[n]o." *Id*. The court stated that it would review all the

evidence and had taken copious notes and took the matter under advisement. Mother's counsel thanked the court, the court stated "[c]ourt's adjourned," Father stated "Your Honor, will they be able to speak and show evidence on their behalf of what's, what is owed," and the court stated "[t]he hearing is over." *Id*. at 111.

[10] In its decree of dissolution, the court awarded physical custody of the children to Mother subject to Father's right of visitation pursuant to the Parenting Time Guidelines. The court found that, for purposes of calculating child support, Father's weekly gross income is $1,346.15, Mother's weekly gross income is $384.62, and Father had twenty-six overnights, and it ordered Father to pay Mother child support of $345 per week. It found that Father failed to pay his obligations of $45,200 during the provisional period. The court found Mother was more credible than Father, Father presented minimal evidence to support his position or controvert Mother's position, and Father removed personal property and equipment in the amount of $196,280 from the marital residence and farm in violation of its order. It awarded the marital residence and twenty acres of farmland to Mother. The court found that the value of the marital estate was $280,787, that an equal division is just and reasonable, and that Father owes Mother an equalization payment of $55,886.50 plus attorney fees of $6,352, and it ordered him to return sufficient property and equipment to her valued at $62,238.50 and that, if he did not, Mother may pursue collection of the monetary amount. Father filed a Petition to Set Aside Decree of

Dissolution of Marriage and/or Motion to Correct Errors, which the court denied.

## *Discussion*

[11] The Indiana Supreme Court has expressed a "preference for granting latitude and deference to our trial judges in family law matters." *In re Marriage of Richardson*, 622 N.E.2d 178, 178 (Ind. 1993). Appellate deference to the determinations of trial court judges, especially in domestic relations matters, is warranted because of their unique, direct interactions with the parties face-to-face, often over an extended period of time. *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011). Thus enabled to assess credibility and character through both factual testimony and intuitive discernment, our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children. *Id.*

[12] When a trial court has made findings of fact, we apply the following two-step standard of review: whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions thereon. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). Findings will be set aside if they are clearly erroneous. *Id.* Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id.* To determine that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made. *Id.* We generally review rulings on motions to correct error for an abuse of discretion. *Miller v. Rosehill Hotels, LLC*, 45 N.E.3d 15, 18 (Ind. Ct. App. 2015).

[13] The admission of evidence is entrusted to the sound discretion of the trial court. *In re A.J.*, 877 N.E.2d 805, 813 (Ind. Ct. App. 2007), *trans. denied*. Further, the decision to deny a motion for a continuance is within the sound discretion of the trial court. *Litherland v. McDonnell*, 796 N.E.2d 1237, 1240 (Ind. Ct. App. 2003), *trans. denied*. The moving party must be free from fault and show that the party's rights are likely to be prejudiced by the denial. *Id*.

[14] The trial court has the duty to manage and control the proceedings before it. *Garcia v. State*, 517 N.E.2d 402, 405 (Ind. 1988). Trial courts exercise broad discretion in making discovery rulings. *Int'l Bus. Machines Corp. v. ACS Human Servs., LLC*, 999 N.E.2d 880, 885 (Ind. Ct. App. 2013), *trans. denied*. Discretion is a privilege afforded a trial court to act in accord with what is fair and equitable in each case. *Id.* An appellate court will interfere only when the appealing party can show an abuse of that discretion. *Id*. Because of the fact-sensitive nature of discovery issues, a court's ruling is given a strong presumption of correctness. *Id*. This presumption extends to its determinations with respect to violations of discovery orders and attendant sanctions, which should not be overturned absent clear error and resulting prejudice. *Id*.

[15] The division of marital property is within the sound discretion of the trial court. *Love v. Love*, 10 N.E.3d 1005, 1012 (Ind. Ct. App. 2014). We consider only the evidence most favorable to the court's disposition of the property. *Id.* Although the facts and reasonable inferences might allow for a different conclusion, we will not substitute our judgment for that of the trial court. *Id.* The court must divide the marital estate in a just and reasonable manner, and an equal division

is presumed just and reasonable. *McGrath v. McGrath*, 948 N.E.2d 1185, 1187-1188 (Ind. Ct. App. 2011) (citing Ind. Code § 31-15-7-5). The presumption may be rebutted by evidence of certain factors including the contribution of each spouse to the acquisition; the extent to which the property was acquired before the marriage or through inheritance or gift; the economic circumstances of each spouse at the time of the disposition; the conduct of the parties during the marriage; and the earnings or earning ability of the parties. *See* Ind. Code § 31-15-7-5. The party challenging the court's division must overcome a strong presumption that it considered and complied with the applicable statute. *McGrath*, 948 N.E.2d at 1188. Marital property includes property owned by either spouse prior to the marriage, acquired by either spouse after the marriage and prior to final separation, or acquired by their joint efforts. *Id.* The court's disposition of the marital estate is to be considered as a whole, not item by item. *Id*. The "one pot" theory specifically prohibits the exclusion of any asset from the scope of the court's power to divide and award. *Kendrick v. Kendrick*, 44 N.E.3d 721, 728 (Ind. Ct. App. 2015), *trans. denied*. While the trial court may ultimately determine that a particular asset should be awarded solely to one spouse, it must first include the asset in its consideration as to how the marital estate should be divided. *Id*.

[16] A trial court's calculation of child support is presumptively valid, and we reverse a decision regarding child support only if it is clearly erroneous or contrary to law. *Saalfrank v. Saalfrank*, 899 N.E.2d 671, 674 (Ind. Ct. App. 2008) (citing *Young v. Young*, 891 N.E.2d 1045, 1047 (Ind. 2008)). We do not

reweigh the evidence and consider only the evidence most favorable to the judgment. *Id*. Ind. Child Support Guideline 3A.1 provides that weekly gross income includes income from, among other sources, salaries, wages, commissions, bonuses, overtime, partnership distributions, dividends, gifts, and inheritance. Child Support Guideline 3A.2 provides in part:

> Weekly Gross Income from self-employment [and] operation of a business . . . is defined as gross receipts minus ordinary and necessary expenses. In general, these types of income and expenses from self-employment or operation of a business should be carefully reviewed to restrict the deductions to reasonable out-of-pocket expenditures necessary to produce income. These expenditures may include a reasonable yearly deduction for necessary capital expenditures. Weekly Gross Income from self-employment may differ from a determination of business income for tax purposes.

> Expense reimbursements or in-kind payments received by a parent in the course of employment, self-employment, or operation of a business should be counted as income if they are significant and reduce personal living expenses. Such payments might include a company car, free housing, or reimbursed meals.

The Commentary to Guideline 3A provides in part that calculating weekly gross income for the self-employed "calls for careful review of expenses" and that "[t]he principle involved is that actual expenses are deducted, and benefits that reduce living expenses (i.e. company cars, free lodging, reimbursed meals, etc.) should be included in whole or in part."

[17] Father asserts that the trial court erred in failing to grant Mother's request to continue the final hearing, that a continuance would have benefitted both parties, and that he was harmed by not being represented by counsel. He

argues that the court erred in denying his ability to present his case in its entirety, that his witnesses would have been able to identify which items were the property of various members of his family, and the time allotted was not sufficient to properly try the matter. He also argues the court erred in determining his child support obligation, Mother should be attributed income from the family farm stand, he suffered a chemical burn and seizure and is not making the same amount as during the marriage, and he should receive a credit for at least ninety-eight overnights.

[18] Mother maintains that Father has waived or invited error regarding all of his arguments. She contends Father never requested a continuance of the final hearing and knew for nearly three months that he was unrepresented and the court allowed him to testify, did not cut his testimony short and rather ensured that he said everything that he wanted to say, and was troubled that he stated he had proof to offer while admittedly and unrepentantly failing to answer her discovery requests. She also maintains the court's child support determination is supported by the evidence.

[19] The record reveals that, in June 2018, the court scheduled the final dissolution hearing for September 2018 and later rescheduled the hearing for November 2, 2018. The court's September 19, 2018 order stated the final hearing was set for one-half day on November 2, 2018, expressly required that the parties be prepared to present the entirety of their cases, that discovery occur before October 19, 2018, and that the parties exchange all exhibits and a witness list at least seven days before the final hearing, and provided that failure to comply

with the order may result in the exclusion of evidence or sanctions. Father indicated that he understood the penalties described in the order. While Mother's counsel may have requested a continuance, Father does not point to the record to show that he requested a continuance prior to or at the final hearing. With respect to Father's failure to respond to discovery requests, he testified "I didn't answer them because I figured you already knew the answers; she has all the documents." Transcript Volume 2 at 87. Although he asked about calling his family members as witnesses at the end of the hearing, he never provided a witness list as required and previously indicated several times that he did not have additional evidence. As for his specific claim regarding the ownership of the property removed from the residence, when asked whether he responded to the request for "any and all documents reflecting the ownership of all items removed from the property," Father replied "[n]o . . . I didn't fill out any of it. I didn't return it to you because she has all the documents." *Id.* at 89. He also indicated that Mother had copies of all of his business expenses for 2017 and stated, "if I did something in the vehicles, [] she got all the receipts" and she had "all the documents." *Id.* at 88. The court provided Father the opportunity to testify regarding his work and the property he removed or helped remove from the marital residence and to thoroughly cross-examine Mother. Under the circumstances, we cannot say that the trial court's rulings managing the proceedings were inequitable or that Father has established clear error resulting in prejudice.

[20] To the extent Father challenges the court's division of the marital estate and its child support determination, we observe the court heard extensive testimony from the parties regarding their real property, the equipment and property located at and removed from the marital residence, their farming activities, and their work and earnings. As for the division of property, the court's order divided the estate equally, principally awarding the real property to Mother and the equipment to Father and ordering that Father make an equalization payment. Father does not appear to challenge the asset valuations and was ordered to return property to Mother to satisfy his equalization payment obligation. In claiming certain property and equipment did not belong to him, Father essentially asserted that it should not be considered part of the marital estate. Father claimed some of the property had belonged to his father and some belonged to other family members. To the extent Father acquired property through inheritance or gift, the marital pot includes any property acquired by the parties prior to or during the marriage, see *McGrath*, 948 N.E.2d at 1188, and the presumption of an equal division may be rebutted to the extent it was acquired through inheritance or gift. *See* Ind. Code § 31-15-7-5. Father testified that his family was very close. Mother testified that she and Father lived together for fifteen years and lived at the marital residence for seven years, that the property belonged to the parties, and that she had not heard Father's claim that someone else owned the property until the dissolution proceedings. She also presented a number of certificates of title. Father never provided any documentation of ownership or responded to discovery requests. The court was

able to consider the testimony and evidence and reject the claim that the property removed by Father and his family was not part of the marital estate.

[21] With respect to child support, Mother submitted a child support worksheet reflecting an annual income of $20,000 and testified that she incurred expenses which reduced that income, and the court found her weekly gross income was $384.62. Father does not point to evidence that Mother has income from the farm stand. *See* Transcript Volume 2 at 14-15 (Mother testifying the parties stopped the farm stand before their separation). Mother testified that Father had exercised twenty-six overnights since he moved out of the marital residence, the court found that he should be given a credit for twenty-six overnights, and he does not point to the record to show that he requested a credit for ninety-eight overnights below. As for Father's income, the court found that his weekly gross income for the purpose of calculating child support was $1,346.15, which corresponds to an annual income of $70,000. There was evidence before the court supporting the court's determination. Mother testified that Father's gross income the previous year was $220,000. When asked Father's net income during the last year for which she knew the expenses, Mother replied she thought it was close to $100,000. The court heard extensive testimony about Father's work activities and earnings. While Mother testified that Father had been injured, she testified that she had recently seen him driving his semi with machinery on a trailer. She testified that a majority of his income is earned as a driver and hauling machinery. The court admitted bank statements covering an eight-month period which showed total deposits of

$177,814.01. Although Father suggested the statements show only his gross income and not his expenses, Mother testified the statements do show expenses and that the parties lived on the money in the account. The bank statements reflect numerous expenditures including at gas stations, convenience and department stores, and restaurants, utility payments, phone payments, credit card payments, and loan payments. The court was able to consider Father's ability to work, work activities, and earnings and the extent to which the expenditures reflected in the bank statements constituted expenses incurred in the operation of his business and the extent to which they reduced his personal living expenses. Based upon the evidence as set forth above and in the record, we do not find Father's arguments that the court erred in determining his child support obligation to be persuasive.

[22] For the foregoing reasons, we affirm the judgment of the trial court.

[23] Affirmed.

May, J., and Mathias, J., concur.